IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

KIM A. BROWN,                          )
                                       )
            Plaintiff,                 )
                                       )
      v.                               )      Case No.
                                       )      15-3528-CV-S-REL-SSA
CAROLYN W. COLVIN, Acting              )
Commissioner of Social Security,       )
                                       )
            Defendant.                 )

**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Kim Brown seeks review of the final decision of the Commissioner of

Social Security denying plaintiff's application for disability benefits under Titles II and

XVI of the Social Security Act ("the Act").  Plaintiff argues that the ALJ erred in giving

more weight to the opinion of consulting physician Dr. Velez than to the opinions of

plaintiff's treating physicians.  I find that the substantial evidence in the record as a

whole supports the ALJ's finding that plaintiff is not disabled.  Therefore, plaintiff's

motion for summary judgment will be denied and the decision of the Commissioner will

be affirmed.

*I.*    *BACKGROUND*

On January 22, 2013, plaintiff applied for disability benefits alleging that she had

been disabled since November 30, 2009, which she later amended to May 6, 2013 (Tr.

at 33).  Plaintiff's disability stems from fibromyalgia, seizure disorder, generalized

anxiety disorder ("GAD"), posttraumatic stress disorder ("PTSD"), and depression.

Plaintiff's applications were denied on June 3, 2013, and June 13, 2013.  On June 17,

2014, a hearing was held before an Administrative Law Judge.  On August 18, 2014,

the ALJ found that plaintiff was not under a "disability" as defined in the Act. On October 27, 2015, the Appeals Council denied plaintiff's request for review. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II. STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of

choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

## III.   BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.      Is the claimant performing substantial gainful activity?

                Yes = not disabled.
                No = go to next step.

2.      Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

No = not disabled.
Yes = go to next step.

3.      Does the impairment meet or equal a listed impairment in Appendix 1?

Yes = disabled.
No = go to next step.

4.      Does the impairment prevent the claimant from doing past relevant work?

No = not disabled.
Yes =  go to next step where burden shifts to Commissioner.

5.      Does the impairment prevent the claimant from doing any other work?

Yes = disabled.
No = not disabled.

## IV.     THE RECORD

The record consists of the testimony of plaintiff and vocational expert Theresa Wolford, in addition to documentary evidence admitted at the hearing.

## A.     ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

**Earnings Record**

The record establishes that plaintiff earned the following income from 1979 through 2014, show in both actual and indexed figures:

| Year | Actual Earnings | Indexed Earnings |
|------|-----------------|------------------|
| 1979 | $ 696.00        | $ 2,449.79       |
| 1980 | 713.00          | 2,302.25         |
| 1981 | 0.00            | 0.00             |

4

| | | |
|---|---:|---:|
| 1982 | 120.79 | 335.87 |
| 1983 | 3,098.63 | 8,215.74 |
| | | |
| 1984 | 10,185.25 | 25,505.93 |
| 1985 | 4,320.58 | 10,377.47 |
| 1986 | 5,860.03 | 13,669.31 |
| 1987 | 10,180.77 | 22,324.30 |
| 1988 | 9,903.93 | 20,697.85 |
| | | |
| 1989 | 19.68 | 39.56 |
| 1990 | 406.42 | 780.94 |
| 1991 | 3,376.11 | 6,254.16 |
| 1992 | 7,217.86 | 12,715.75 |
| 1993 | 9,832.24 | 17,173.82 |
| | | |
| 1994 | 10,115.68 | 17,207.08 |
| 1995 | 10,145.17 | 16,592.17 |
| 1996 | 14,659.42 | 22,857.27 |
| 1997 | 7,139.16 | 10,517.80 |
| 1998 | 16,652.43 | 23,313.09 |
| | | |
| 1999 | 12,812.46 | 16,990.36 |
| 2000 | 14,926.00 | 18,755.89 |
| 2001 | 17,074.24 | 20,955.43 |
| 2002 | 22,352.02 | 27,160.52 |
| 2003 | 23,122.02 | 27,425.74 |
| | | |
| 2004 | 23,958.56 | 27,155.58 |
| 2005 | 23,731.81 | 25,949.09 |
| 2006 | 2,525.10 | 2,639.69 |
| 2007 | 14,647.77 | 14,647.77 |
| 2008 | 20,580.63 | 20,580.63 |
| | | |
| 2009 | 17,307.59 | 17,307.59 |
| 2010 | 0.00 | 0.00 |
| 2011 | 0.00 | 0.00 |
| 2012 | 5,519.39 | 5,519.39 |
| 2013 | 0.00 | 0.00 |
| | | |
| 2014 | 0.00 | 0.00 |

(Tr. at 171-172).

**Function Report**

In a Function Report dated February 14, 2013, plaintiff reported that her typical day involves getting up at 8:00 a.m., making coffee, getting dressed. She watches television, listens to the radio, or watches the birds outside her window. At noon she makes a sandwich for lunch and watches television. At 5:00 p.m. she has soup or a sandwich for dinner. She takes a bath with Epsom salt because of her pain. She watches more television and does the assignments her therapist has given her. At 9:00 p.m. she takes a sleeping pill and goes to bed (Tr. at 264).

Plaintiff wakes up at all hours of the night (Tr. at 265). It is hard for her to get shirts on over her head, she cannot wash her back, and it is difficult for her to blow dry her hair (Tr. at 265). She needs no special reminders for anything. She prepares her own meals daily, but she no longer cooks. Plaintiff is able to dust once a week for 10 minutes, and she can do laundry every other week for 1 1/2 hours. When plaintiff goes out, she drives and can go out alone. She shops in stores once a month for an hour. Her hobbies include watching television and reading, although she usually has to read things more than once due to her impaired memory (Tr. at 268). Plaintiff spends time with others watching movies or talking on the phone. She does not go any place on a regular basis other than therapy due to her anxiety and depression.

Plaintiff's impairments affect her ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, remember, complete tasks, concentrate, understand, follow instructions and use her hands (Tr. at 269). She can walk 2 blocks before needing to rest for 10 minutes (Tr. at 269). She can pay attention for about 30 minutes.

6

**B.    SUMMARY OF MEDICAL RECORDS**

Many of plaintiff's medical records predate her alleged onset of disability.

On August 1, 2012, plaintiff was evaluated by Dennis Handley, M.D., in connection with her application for public assistance (Tr. at 347-351, 357-360).  Plaintiff reported having stopped taking all medication a year earlier due to having no insurance and no means of paying for her medicine.  She reported having been treated in the past for fibromyalgia, major depression and epilepsy.  Plaintiff was smoking 1/2 pack of cigarettes per day. She reported having started smoking at age 13.

Plaintiff reported that she worked at Booneville Correctional Center for 2 years. She moved to Springfield and worked as a museum assistant for 7 years, then worked as a janitor for a year and a half at Drury College.  She was unemployed for 2 years. Recently she worked for 2 days at McDonald's and 2 weeks at K-Mart but could not keep working due to pain and fatigue from fibromyalgia.  She worked for a month at Indeeco before being laid off, and she was presently working for Sisters for Assisted Living, working 30 hours a week one week and 46 hours the next.  She had been doing this for the past 6 months.

Plaintiff reported having had a grand mal seizure in 2006 and a possible smaller type seizure as she was driving on another occasion.  Plaintiff reported being depressed since 2006 when she lost a good-paying job and started having more problems with fibromyalgia.

Dr. Handley performed an exam and found that plaintiff is 5' 5" tall and weighed 101.5 pounds.  Plaintiff's physical exam was normal.  Dr. Handley assessed "history

consistent with fibromyalgia;" major depression, mild, recurrent; and history of isolated grand-mal seizure several years ago.  Dr. Handley recommended that plaintiff get back on her medications and get a colonoscopy.  "She does not feel that she can afford any of these measures at present."  Dr. Handley completed the form finding that plaintiff's "complaints of chronic fatigue, sore & painful muscles, are felt by her [to] prevent her from finding and keeping gainful employment." (Tr. at 350).  Dr. Handley checked the box indicating that plaintiff does not have a mental and/or physical disability preventing her from engaging in employment.  "The large majority of patients with fibromyalgia should be able to continue working."

On August 13, 2012, plaintiff saw Marsha Kempf, a nurse practitioner, for an evaluation in connection with her application for public assistance (Tr. at 342-345).  The report was signed by Robert Frick,  M.D.  Plaintiff drove herself to the appointment.  Plaintiff said that her physical problems cause her to be depressed.  She rated her mood a 5 out of 10.  She said she was tired all the time.  She reported feeling hopeless with some irritability.  Lack of finances was keeping her from doing a lot.  Plaintiff said that in the past, her excess worrying has caused vomiting and diarrhea.  Although plaintiff reported having been the victim of a crime at age 15, she denied bad dreams, flashbacks, or intrusive thoughts.  Plaintiff said most of her fibromyalgia pain is in her left foot.  Plaintiff reported that she is a certified diamond cutter.  She had all of her own equipment for diamond cutting, but a tornado came through Springfield and destroyed all of her equipment.  She had been working in assisted living taking care of four girls, but she quit the week before due to stress.

8

A mental status exam was performed. Plaintiff was described as guarded. "Very difficult to get answers from her about mental health. Irritability is present and she has a low threshold for stress as seen by her most recent job of 4 weeks - quit 'b/c it was too stressful.'" She was assessed with major depressive disorder and generalized anxiety disorder with a GAF of 50.[1] "She does need counseling and medications to treat generalized anxiety disorder and depression. She denies PTSD symptoms but this may be more of a problem than she identifies. If she participates in treatment she should have improved functioning in 6-12 months."

On September 25, 2012, plaintiff was seen at Cooper County Public Health to establish care (Tr. at 356). She said she wanted to get back on her medications and had been off of them for a year. She reported all-over pain, especially in her feet. She continued to smoke but reportedly was trying to quit. She said she was due for a colonoscopy; that she had precancerous colon polyps in 2009. Plaintiff reported a history of fibromyalgia, depression, generalized anxiety disorder, and seizure, although her last seizure was a few years earlier.

On October 3, 2012, plaintiff had a colonoscopy which was normal (Tr. at 361).

On December 5, 2012, plaintiff saw Mona Brownfield, M.D., at Cooper County Public Health to initiate care (Tr. at 355). Plaintiff said her fibromyalgia had been "pretty bad recently." She reported pain, feeling achy all over, and poor sleep. Plaintiff

---

[1]A global assessment of functioning of 41 to 50 means serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).

reported the Elavil[2] 25 mg does not help; she increased that to 50 mg a day on her own without much relief.  She reported high anxiety for which she was taking Wellbutrin XR[3] but it was not helping.  Plaintiff wanted to be seen at Burrell Behavioral Health.  Plaintiff reported her pain a 6 out of 10.  On exam she was noted to have clear lungs and a normal heart rate.  No further examination was performed.  Dr. Brownfield assessed fibromyalgia and prescribed Cymbalta.[4]  For insomnia, Dr Brownfield stopped plaintiff's Elavil and prescribed Trazodone.[5]  She also discussed with plaintiff the need to stop drinking coffee until 5:00 in the evening and other sleep hygiene habits.  She referred plaintiff to Burrell for anxiety and indicated that the Cymbalta should also help with that.

On December 10, 2012, plaintiff was evaluated at Burrell Behavioral Health by Sandra Lillard, a social worker (Tr. at 325-332).  Plaintiff reported a long history of depression and generalized anxiety disorder.  Plaintiff reported frequent crying, agitation, and fatigue.  She reported struggling with sleep but said Trazodone was helping and that she was sleeping "plenty" but she still felt tired all the time.  She reported trouble concentrating and said she forgets things easily.  She worried primarily about finances and her relationship.  Her current mental health treatment consisted of her primary care physician prescribing antidepressants.  Plaintiff had never been hospitalized for mental health treatment.  She had been on medication only briefly; her

---

[2]An antidepressant, also known as Amitriptyline.

[3]An extended-release antidepressant, also known as Bupropion.

[4]An antidepressant.

[5]An antidepressant.

previously mental health treatment consisted only of therapy which was helpful but did not resolve her symptoms. Plaintiff began having seizures in 2006 and there "is no known reason as to why." She said she was diagnosed with fibromyalgia in 2009. She had "cancerous colon polyps" five years ago but said she was currently cancer free. She was smoking but reportedly trying to quit. Plaintiff was covered by Medicaid. She denied financial problems even though she indicated it was one of her major anxieties. Plaintiff was employed part time taking care of adults with developmental disabilities. She was living with her significant other.

Plaintiff's diagnoses based on this interview were major depressive disorder and generalized anxiety disorder with a GAF of 49 (see footnote 1, page 9).

On January 7, 2013, plaintiff saw Mona Brownfield, M.D., for a follow up on fibromyalgia (Tr. at 354). Plaintiff's Trazodone was helping sometimes. She rated her pain a 5 out of 10. No physical exam was performed. Dr. Brownfield increased plaintiff's Cymbalta from 20 mg once a day to 20 mg twice a day. She increased the Trazodone from 100 mg at night to 150 mg at night. Plaintiff was told to seek counseling and to return in two months. Also on this visit, Dr. Brownfield completed a Verification of Disability in connection with plaintiff's application for housing assistance (Tr. at 335-337). She checked the "yes" box indicating that plaintiff has a disability, as defined in 42 U.S.C. § 423, which means an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. She also checked the "yes" box

indicating that plaintiff has a physical, mental or emotional impairment that is expected to be a long-continued and indefinite duration, substantially impedes her ability to live independently, and is of such a nature that the ability to live independently could be improved by more suitable housing conditions.

On March 6, 2013, plaintiff saw Mona Brownfield, M.D., for a follow up (Tr. at 461-463). Plaintiff weighed 108 pounds. She rated her pain a 6 out of 10 -- she complained of pain all over and muscle spasms in her feet. Baclofen (muscle relaxer) was not helping, "wants to try Flexeril." She said the Cymbalta had not helped. "Complaints of joint pain, limited range of motion, muscle aches, stiffness." Dr. Brownfield observed that plaintiff appeared well and comfortable. Her physical exam consisted of listening to plaintiff's heart and lungs. She assessed primary fibromyalgia syndrome. Dr. Brownfield prescribed Flexeril (muscle relaxer), discontinued Baclofen, and increased the Cymbalta. She recommended daily exercise, especially swimming, but at least 30 minutes of exercise per day five days per week.

On March 22, 2013, Amanda Crabtree, a counselor with a masters degree in mental health counseling, wrote a letter to Disability Determinations (Tr. at 375). Ms. Crabtree had been seeing plaintiff in therapy for the past two months.

> [Plaintiff's] therapy and my clinical impressions have influenced me to assess and diagnose her with PTSD and Major Depressive Disorder - Recurrent episodes. . . . The client experiences depressed mood most of the day nearly every day as well as sleep issues with insomnia at times and hypersomnia at other times. She suffers from a diminished ability to think or concentrate at times and has issues with indecisiveness, fatigue or loss of energy, and marked diminished pleasure or interest in almost all activities for most of the day nearly every day.

12

From the client's perspective it has been determined that she has experienced some very traumatic events from childhood to early adulthood that have not been processed or completely worked through which can lead to a symptomatic response in the form of depression. These mental health issues currently cause the client to experience some impairment with memory, sustaining concentration and social interactions. . . .

The client is currently attending weekly therapy sessions as well as family and couples therapy as needed and she is taking the following medications/dosages as directed by her doctor: Gabapentin 300 mg three times per day for seizures, Buproprion 150 mg twice per day, Cymbalta 30 mg per day for depression, Cyclobenzapr[ine][6] 10 mg per day and Trazodone 150 mg at bedtime. At this present time she is only able to work part time due to the chronic pain that she experiences on a daily basis and impairment in the social and occupational areas of her life related to the previously described mental illnesses within her mental health diagnosis.

On April 3, 2013, plaintiff saw Mona Brownfield, M.D., for a follow up (Tr. at 365-368). Plaintiff rated her pain a 6 out of 10; her pain was all over and she was having muscle spasms in her feet. She reported that Baclofen (muscle relaxer) 10 mg three times a day was not helping, and she said she wanted to try Flexeril (muscle relaxer). She had not noticed any improvement on Cymbalta 20 mg twice a day. Plaintiff complained of fatigue, joint pain, limited range of motion, muscle aches and stiffness. Dr. Brownfield described plaintiff as "well appearing, comfortable." Her physical exam was limited to listening to plaintiff's heart and lungs, both of which were normal. She assessed fibromyalgia and prescribed Flexeril. She also prescribed Wellbutrin SR 150 mg twice a day, Cymbalta 30 mg twice a day, and Trazodone 150 mg at bedtime (all antidepressants); Piroxicam (non-steroidal anti-inflammatory), 20 mg once a day; and Gabapentin (treats nerve pain), 300 mg three times a day. She told plaintiff to exercise

_____

[6]A muscle relaxer, also known as Flexeril.

daily -- "swimming is best." Plaintiff was told to exercise 30 minutes a day, five days a week; get adequate sleep; and return in two months.

On April 15, 2013, plaintiff saw Mark Schmitz after having been referred by Disability Determinations (Tr. at 377-381). Mr. Schmitz, who has a masters degree is psychology, met with plaintiff for 50 minutes and reviewed her records from Burrell Behavioral Health, the Cooper County Rural Health Clinic, and Bonnie Riley Counseling and Consulting. Plaintiff drove herself to the appointment and arrived 15 minutes early. She was dressed appropriately and her hygiene was well maintained. She was observed to walk with a limp, but otherwise gait and posture were normal.

Plaintiff said she graduated from high school with a D average. In 1992 or 1993 she completed training to be a certified diamond cutter. "She continued by stating that she then attempted to work as a diamond cutter, but stated it was immediately clear she was unable to do the job adequately due to problems with pain and coordination." Plaintiff discussed her past employment history and indicated that she was currently working from 10:00 p.m. Friday to 4:00 p.m. on Saturday as a residential worker at Unlimited Opportunities, a supportive living facility. Plaintiff had been in a relationship for a number of years but had recently moved out of the home they shared and moved into her own apartment in a facility for disabled individuals and/or older adults.

Mr. Schmitz performed a mental status exam. He noted that plaintiff appeared to be depressed, worried, and on the verge of tears throughout the examination.

The results of the current examination indicate that she is suffering from a major depressive disorder, but there does not appear to be any psychotic features. Her depression is characterized by sad mood, frequent tearfulness, sleep

14

disturbance, increased irritability, poor concentration, loss of interest, and social isolation. Additionally, she appears to meet criteria for a diagnosis of generalized anxiety disorder.

With regard to the referral questions, Ms. Brown appears capable of understanding and remembering instructions. Her ability to sustain concentration and persistence in tasks, however, is likely to be moderately to significantly impaired as a result of her depression and anxiety. Her ability to interact in a socially appropriate and adaptable manner also appears to be moderately impaired due to her emotional difficulties. Although she is currently working part-time, it is doubtful that she would be able to maintain full-time employment. Finally, if disability benefits are allowed, Ms. Brown appears capable of managing any resulting funds in her own behalf.

Mr. Schmitz assessed major depressive disorder, recurrent, severe without psychotic features and generalized anxiety disorder with a GAF of 43 (see footnote 1, page 9).

On April 24, 2013, Mona Brownfield, M.D., completed a one-page questionnaire from Disability Determinations (Tr. at 383). She indicated that plaintiff would not be able to sustain an 8-hour/40-hour-per-week workweek; she is not able to stand or walk for 6 hours per day with breaks; she is able to sit for 6 hours per workday; and she could frequently lift less than 10 pounds.

May 6, 2013, is plaintiff's amended alleged onset date. On that day she saw Mona Brownfield, M.D., for a follow up (Tr. at 464-465). Plaintiff weighed 117 pounds. She rated her pain a 7 out of 10. Plaintiff continued to smoke. Plaintiff said she could not tell any difference from the changes in her medication. Her legs were hurting. Dr. Brownfield observed that plaintiff was well appearing and "overweight." She did not perform any physical exam. She referred plaintiff to a rheumatologist.

On May 15, 2013, plaintiff was seen by Deanna Davenport, APRN, in the Rheumatology IM Clinic after having been referred by Dr. Brownfield (Tr. at 389-390, 447-451). Plaintiff weighed 115 pounds and reported having lost a lot of weight a few years earlier but had recently gained 5 pounds. Plaintiff reported having been diagnosed with fibromyalgia in 2006. She reported chronic daily pain through her neck, shoulders and back. She said her pain was worse with cold, weather changes, and physical activity. Her feet were very painful. She described the flare ups of pain as severe, involving the entire foot, lasting for 1 to 2 days, and happening every 2 to 3 months. Her feet often feel tingly or prickly. Plaintiff reported Trazodone does not help her sleep; she still wakes multiple times per night. Gabapentin (treats nerve pain), which she said she was taking for seizure disorder, was not helping her pain. She said Cymbalta (antidepressant) was providing no benefit. "She has chronic depression/anxiety and PTSD, denies meds have ever been helpful." Plaintiff said she was seeing a counselor once a week[7] but "only has a few sessions left. She is diffusely tender to touch."

On exam plaintiff's range of motion was normal in her hands, wrists, elbows, shoulders, back, hips, knees, ankles, and feet. She was diffusely tender with 16 out of 18 fibromyalgia tender points. Ms. Davenport assessed the following:

> 1. Fibromyalgia. Based on her current symptoms, I don't doubt this diagnosis, but to formally say this, we have to rule out any mimics. Given her symptoms, should rule out Sjogren's syndrome, rheumatoid arthritis. Also any nutritional deficits that might be contributing to symptoms.

---

[7]Those records are not a part of the administrative record that was before the ALJ or before me.

2.      Active depression/anxiety, PTSD.  This is also playing an active role in her pain.  In fact, there is a high link between PTSD and fibromyalgia.

3.      Seizure disorder.  Hasn't had a seizure in years, on Gabapentin for treatment.  Has never tried a higher dose.

Ms. Davenport ordered lab work which showed that plaintiff's Vitamin D was low and her FANA[8] test was positive (Tr. at 385-387, 391-392).  Ms. Davenport increased plaintiff's Gabapentin and Trazodone, recommended a support group, and told her to return in 3 weeks.

On May 20, 2013, plaintiff saw Debra Kolvunan, M.D., for a condition unrelated to her disability case (Tr. at 403).  On this visit, plaintiff reported that she continued to smoke about 2 packs of cigarettes per week and had been a smoker for 30 years.

On May 28, 2013, plaintiff saw Dennis Velez, M.D., for allegations of fibromyalgia, seizure disorder, depression, PTSD, and anxiety, after having been referred by Disability Determinations (Tr. at 406-412).  Plaintiff drove herself to the appointment.  Dr. Velez reviewed the notes and evaluations from plaintiff's other providers.

HISTORY OF PRESENT ILLNESS:

Seizure Disorder:  The claimant states that many years ago she was playing when she was hit by a ball on the side of her head.  She had transient loss of consciousness as well as amnesia for the events.  Reportedly when she fell she had some shaking.  Because of that she was placed on anticonvulsants.  The claimant however never had any seizure workup such as an EEG or any imaging studies.  She continues to drive.  She has never had any other seizures.  The claimant [has] total recollection and [was] evaluated for possibility of any other

_____

[8]Immunofluorescent antinuclear antibody - a test for Lupus.  Although this test is positive in almost all individuals swith systemic lupus, it can also be weakly positive in about 20% of health individuals.

seizure mimic such as stroke or any type of hypoglycemic episode. The claimant denies having had any type of febrile seizures as a child.

Depression, Posttraumatic Stress Disorder and Anxiety: The claimant states that she has had multiple difficult relationships as well as multiple employment opportunities all of which she has lost. She also has been in what sounds like abusive relationships. These all contributed to her feelings of posttraumatic stress disorder, anxiety and depression with the claimant having difficulty sleeping and eating. Also the claimant experiences hopelessness and she cannot find any type of viable health care for herself and continues to have significant pain.

Fibromyalgia: The claimant was diagnosed with fibromyalgia several years ago after she started complaining of pain in her back as well as joints and muscles. The claimant complains of associated stiffness and cramps. The claimant has tried taking Cymbalta, which according to her helps, however, she has requested heavier pain medications, but according to her she has been denied of these medications and feels that no one really understands how much pain she is in.

Dr. Velez performed a physical exam and noted that plaintiff had a flat affect but maintained appropriate eye contact. Her gait and stance were normal. She had full strength in all of her extremities, and there was no evidence of fasciculations,[9] tremors, atrophy or rigidity. Plaintiff had no joint deformity, no limitation of range of motion. Plaintiff was able to bend over and touch her toes, reach overhead, squat and rise from a squatting position. She had negative Babinski's, which is a test involving stimulating the sole of the foot. There is nothing in the record indicating that plaintiff reported problems with pain in her feet or that Dr. Velez noted any unusual reaction when he stimulated the soles of plaintiff's feet.

IMPRESSION:

---

[9]A brief spontaneous contracting of muscle fibers often causing a flicker of movement under the skin.

From the claimant's allegation of fibromyalgia on my examination today she did not meet criteria of having at least tender points of pressure on examination today; however, she does have some passing reference on her documentation that she has this condition and on my examination today she failed to reproduce such points.

From the allegation of seizure disorder she has also passing documentation of relaying this information to another provider in the past, but has no significant findings regarding this on examination, has never seen a neurologist, continues to drive and has never had any further seizures.

From the allegation of anxiety, depression and posttraumatic stress disorder the claimant demonstrated a flat affect today on examination although she was cooperative with the exam.

Based on all the information provided today this claimant does not have limitations as far as sitting, standing or walking. She does not have any manipulative limitations, lifting or carrying limitations and no verbal or written communication problems.

DIAGNOSES:

1.    History of anxiety and depression.
2.    History of seizure in the past now resolved.

On July 25, 2013, plaintiff saw Deanna Davenport, a nurse practitioner (Tr. at 452-454). Plaintiff reported that the increase in Gabapentin did not improve her pain. "She's having some ups and downs with the weather, only sleeping about 3 hours at night. Feet are tingling a lot, lots of muscle spasms. New numbness right 1-3rd fingers, with shooting pains with use. Mood is poor." Plaintiff had normal range of motion in hands, wrists, elbows, shoulders, back, hips, knees, ankles and feet. She had 16 of 18 fibromyalgia tender points. Plaintiff's previous blood work had no deficiencies except low Vitamin D. Ms. Davenport assessed "fibromyalgia. Still fairly active, no response to higher doses of Gabapentin, also on Cymbalta. Describing a lot of pain, muscle

19

spasms. . . .  Plan at this time is to reduce Gabapentin back to 300 mg three times a day, and when she's back down, we'll try Lyrica.[10]  I don't want to stop Gabapentin entirely, she's on for seizures. . . .  She's tried many muscle relaxants without benefit, we'll try methocarbamol[11] now, 750 mg three times a day as needed for muscle spasm.  Call with concerns, work on mild daily aerobic exercise.  Follow up in 3 months."

On August 12, 2013, plaintiff saw Mona Brownfield, M.D., complaining of numbness (Tr. at 468-470).  Plaintiff rated her pain a 7 out of 10.  She weighed 124 pounds, and her blood pressure was normal at 120/80.  Plaintiff continued to smoke.  Dr. Brownfield observed that plaintiff was well appearing but had decreased sensation in her right foot and the back of her hand.  Beyond that Dr. Brownfield's exam was limited to listening to plaintiff's heart and lungs.  She assessed "numbness" and ordered an MRI of plaintiff's brain.

On October 28, 2013, plaintiff saw Deanna Davenport, a nurse practitioner (Tr. at 455-456).  Plaintiff reported no help with pain from Gabapentin, Cymbalta or Lyrica.  She was sleeping OK with Trazodone.  "Depressed, diffuse pain persists."  Plaintiff's work up for inflammatory arthritis was normal.  On exam plaintiff had normal range of motion everywhere; she had 16 of 18 fibromyalgia tender points.  Ms. Davenport increased plaintiff's Lyrica to 150 mg twice a day.  "Weight loss recommended."  There is no weight listed on this or any other record by Ms. Davenport, but the last time

---

[10]Treats nerve pain, muscle pain, fibromyalgia, and seizures.

[11]A muscle relaxer, also known as Robaxin.

plaintiff's weight is recorded on a medical record was from about two months earlier when she weighed 124 pounds.

On November 4, 2013, a comprehensive clinical assessment was performed at Burrell Behavioral Health (Tr. at 416-442). Plaintiff reporting living alone. She said her medication does not help as much as she would like.

> Client reports she worries about bills and money matters. Client worries about her disability if she is going to get it or not. She states she is agitated and tired. She struggles with sleep but states Trazodone is helping. Client reports she feels tired 'all the time.' She has trouble concentrating and forgets things easily. Client reports she is not experiencing as much anxiety as she was a year ago. Client reports she experiences depression. She is tired all the time and depressed about her situation. Client reports she only eats about one meal a day. Client reports she has physical pain that causes her not to want to do anything.

Regarding PTSD, plaintiff said she has flashbacks just about every day, and the flashbacks are to abuse she experienced when she was 7 and 9 years old although she said she believes she has "blocked much of it out." Plaintiff's anxiety and depression began in 2006 when she lost a good job due to major health problems. Plaintiff reported that she was currently earning money doing odd jobs and selling things at the local flea market. She was also getting food stamps and commodities. She said she likes to go camping and play pool. Plaintiff reported that she exercises for 20 minutes per day two days per week. She said she has pain in her feet, right hand, lower back, and neck, and she described the pain as moderate.

Plaintiff's general health status was rated as "fair." She was described as restless. Her mood and affect were appropriate. She had no difficulty paying attention during the exam. She was not distractible. She was able to focus on the questions.

Her speech was normal.  Although plaintiff reported having problems with short term memory (Tr. at 433), no memory problems were observed by anyone performing this evaluation.  Plaintiff reported no problems with her daily physical needs, and she said she "does ok" taking care of her home.  Plaintiff was asked what her biggest need is, and she said "figure out how to have a healthy relationship."

Plaintiff was assessed with major depressive disorder, recurrent, mild; and PTSD with a GAF of 50 (see footnote 1, page 9).

On November 18, 2013, plaintiff saw Deanna Davenport, a nurse practitioner (Tr. at 457-458).  Plaintiff's diffuse pain was "a bit better" on the increased dose of Lyrica. "Hand pain and numbness persists.  EMG/NCV[12] did not show CTS [carpal tunnel syndrome], but this is a pattern I see frequently in fibromyalgia patients.  Their nerves are so sensitive, that they pick up on even minor nerve compression and produce symptoms.  Night splinting alone has not helped, so Kimberly is here today to have injection therapy."  Plaintiff's blood pressure was 144/87.  Her range of motion was entirely normal.  She had 16 of 18 fibromyalgia tender points.  Ms. Davenport injected plaintiff's wrists with Lidocaine.

That same day plaintiff had x-rays of her low back due to complaints of back pain (Tr. at 459).  The x-rays were normal except sacralization of L5, which is a congenital anomaly in which the fifth lumbar vertebra is fused to the sacrum in varying degrees.

On December 6, 2013, plaintiff saw Mona Brownfield, M.D., due to having elevated blood pressure when she saw Ms. Davenport a few weeks earlier (Tr. at 466-

---

[12]Tests to diagnose carpal tunnel syndrome.

467).  Plaintiff weighed 121 pounds.  She rated her pain a 6 out of 10.  She continued

to smoke.  "BP [was elevated] at rheumatologist.  Has been normal here.  Doesn't eat

much salt.  Patient used to have hypertension and be on meds 4-5 years ago.  Blood

pressure was 180 at rheumatologist."[13]  Dr. Brownfield observed that plaintiff was well

appearing and comfortable.  Her exam was limited to checking symptoms of sinus

infection and listening to plaintiff's heart and lungs.  She assessed sinus infection and

increased blood pressure.  Plaintiff was told to monitor her blood pressure.

On December 16, 2013, plaintiff saw Shyamala Bheemisetty, M.D., a

psychiatrist, to establish care and for medication management (Tr. at 443-445).  Plaintiff

reported feeling depressed for the last week because her relationship had ended.  She

reported sleeping well with Trazodone, going to bed around 10:00 p.m. and waking up

at 6:30 a.m.  Her appetite was OK.  She reported low energy and trouble focusing.  She

reported having flashbacks to childhood abuse and panic attacks almost every day.

Plaintiff was smoking a half a pack of cigarettes per day but said she was trying to quit.

> Mental Status Examination:  The patient is a 48-year-old female who was
> dressed casually in her own clothes.  She was alert, awake and oriented to time,
> place and person.  She was calm and cooperative during the interview.  Mood
> was described as "sad and tired."  Affect was congruent with the stated mood; at
> times tearful but stable.  Thought process was linear and goal-directed.  Thought
> content was negative for suicidal or homicidal ideations.  Denied auditory or
> visual hallucinations.  Does endorse feeling paranoid about her relationships.
> Insight and judgment are fair.

---

[13]There are no medical records from a rheumatologist.  Plaintiff was seeing Ms.
Davenport, a nurse practitioner, in a rheumatology clinic.  Her blood pressure was not
180 in any record before me, but was high at 144/87 the last time she saw Ms.
Davenport.

Dr. Bheemisetty assessed major depressive disorder, recurrent, moderate; and PTSD by history with a GAF of 52.[14]  She increased plaintiff's Cymbalta to 90 mg per day for anxiety and depression; continued Wellbutrin SR 150 mg twice a day for anxiety; prescribed Prazosin[15] 1 mg daily for flashbacks and PTSD symptoms; and continued plaintiff's Trazodone for insomnia.  She recommended plaintiff continue therapy and return for a follow up in two months.

On January 26, 2014, plaintiff saw Deanna Davenport, a nurse practitioner (Tr. at 478-479).  Plaintiff reported that the wrist injections helped; the numbness was not nearly as severe.  Plaintiff reported that her mood was OK, and she believed Lyrica was making her daily pain more tolerable.  "Still will be sorry if she overdoes physically, and the cold tends to flare too."  Plaintiff had normal range of motion everywhere; 16 out of 18 fibromyalgia tender points.  Plaintiff's sleep and mood were OK.

On February 12, 2014, Deanna Davenport, a nurse practitioner, completed interrogatories in connection with plaintiff's application for benefits (Tr. at 472).  When asked for the basis for a diagnosis of fibromyalgia, Ms. Davenport wrote:

> She has chronic diffuse musculoskeletal pain with tenderness to touch, chronic poor sleep and associated cognitive deficits.  Full workup to rule out autoimmune or infections, degenerative causes was done.  Per American College of Rheumatology's classification criteria, she has fibromyalgia.  Daily significant fatigue is seen with fibromyalgia.  Fibromyalgia also causes chronic widespread musculoskeletal pain which is usually worsened by physical activity.

---

[14]A global assessment of functioning of 51 to 60 means moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).

[15]Used to treat PTSD.

Ms. Davenport also completed a Medical Source Statement Physical (Tr. at 473-475). She found that plaintiff can lift not more than 5 pounds. She can stand or walk for 20 minutes at a time and for a total of 2 hours per day. She can sit for 15 to 20 minutes at a time and for a total of 3 hours per day. She is limited to pushing and pulling 5 minutes of low weight/pressure. She can never climb, stoop, kneel, crouch, bench or reach. She can occasionally balance, handle and finger. She can frequently feel. "Any physical activity increases pain, even minor motions as with hands. She would be limited to 15-20 minutes at a time before a break would be needed." Ms. Davenport noted that reclining or lying down for 30 minutes at a time one to three times per day is necessary to control plaintiff's existing pain and fatigue.

On February 17, 2014, plaintiff saw Shyamala Bheemisetty, M.D., a psychiatrist, for a follow up (Tr. at 485-486). Plaintiff reported continuing to feel depressed. She continued to be worried about finances and the end of her romantic relationship. Plaintiff reported waking after four or five hours of sleep and having difficulty going back to sleep. She reported still having some flashbacks during the daytime. She reported feeling tired and having trouble focusing. Dr. Bheemisetty assessed major depressive disorder, recurrent, moderate, and PTSD by history with a GAF of 52 (see footnote 14, page 24). She increased plaintiff's Cymbalta, added Remeron for insomnia and mood stabilization, and continued all the other medications.

On April 7, 2014, plaintiff saw Shyamala Bheemisetty, M.D., for a follow up (Tr. at 487-488). Plaintiff reported "still feeling a little depressed." She was sleeping OK although was waking up in the middle of the night and falling back to sleep. Plaintiff

had been taking a nap during the day as well.  Plaintiff rated her anxiety a 5 out of 10 and said she has trouble focusing when she is anxious.  Dr. Bheemisetty observed that plaintiff was calm and cooperative during the interview.  Her affect was "at times cheerful but stable."  Attention and concentration were fair.  Insight and judgment were fair.  Dr. Bheemisetty assessed major depressive disorder, recurrent, moderate and PTSD by history with a GAF of 52.  She increased plaintiff's Cymbalta and decreased her Trazodone.

On April 17, 2014, plaintiff saw Deanna Davenport, a nurse practitioner, for a follow up (Tr. at 480-481).  Plaintiff reported that she was not sure Lyrica was helping.  "Went 3 days without it when getting refill, didn't notice much difference."  Plaintiff reported daily pain in her feet, knees, neck, and low back.  "Mood OK, still smoking, not exercising regularly."  Plaintiff had normal range of motion everywhere; 16 out of 18 fibromyalgia tender points.  "[R]eviewed how lifestyle modification, such as sound sleep, regular exercise, counseling can aid [in pain reduction] as well."

On May 19, 2014, Shyamala Bheemisetty, M.D., plaintiff's psychiatrist, completed a mental residual functional capacity form (Tr. at 482-484).  She found that plaintiff's limitations in the following functions preclude performance for 20% of an 8-hour workday:

- The ability to carry out detailed instructions
- The ability to maintain attention and concentration for extended periods[16]

---

[16]For some reason, this limitation appears on the form twice, as number 3 and again as number 6.  Typically on these forms number 3 is "the ability to understand and remember detailed instructions," a limitation which is not ranked on the form that was

- The ability to work in coordination with or proximity to others without being distracted by them

- The ability to respond appropriately to changes in the work setting

She found that plaintiff's limitations in the following functions preclude

performance for 10% of an 8-hour workday:

- The ability to remember locations and work-like procedures

- The ability to understand and remember very short and simple instructions

- The ability to carry out very short and simple instructions

- The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances

- The ability to sustain an ordinary routine without special supervision

- The ability to make simple work-related decisions

- The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods

- The ability to interact appropriately with the general public

- The ability to ask simple questions or request assistance

- The ability to accept instructions and respond appropriately to criticism from supervisors

- The ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes

- The ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness

- The ability to be aware of normal hazards and take appropriate precautions

---

given to Dr. Bheemisetty.

- The ability to travel in unfamiliar places or use public transportation
- The ability to set realistic goals or make plans independently of others

Finally, Dr. Bheemisetty found that plaintiff would miss two or more days of work per month due to psychologically based symptoms.

## C.    SUMMARY OF TESTIMONY

During the June 17, 2014, hearing, plaintiff testified; and Theresa Wolford a vocational expert, testified at the request of the ALJ.

## 1.    Plaintiff's testimony.

At the time of the hearing plaintiff was 49 years of age and is currently 51 (Tr. at 34). She is 5' 4" tall and weighs about 110 pounds (Tr. at 34). She is not married and has no children (Tr. at 34). She lives alone in a senior disabled apartment (Tr. at 34).

Plaintiff has a high school education and went to school for a few years to become a certified diamond cutter (Tr. at 35). Plaintiff previously worked as a custodian at Drury University (Tr. at 35). She worked in security (walking around all day monitoring the premises) for seven years for the City of Springfield, and then she was promoted to an office assistant and administrative assistant (Tr. at 35). She also did home care for Health Care Services of the Ozarks (Tr. at 36). Plaintiff currently has a flea market booth -- she sells her belongings trying to pay her utilities (Tr. at 36). Her rent is free, and she is on Medicaid (Tr. at 36).

Plaintiff has a Class E chauffeur's license (Tr. at 36). She had to get this when she was working at Unlimited, a job she performed for six to eight months (Tr. at 36-37). At that job she "took care for the table ladies." (Tr. at 37). Plaintiff worked 18 hours a

week (Tr. at 37). She went to work at 10:00 p.m. and worked until the next day at 4:00 p.m. (Tr. at 37-38). A few minutes after she got to work, the ladies would go to bed and plaintiff would lie down (Tr. at 38). During the day she made sure they got their meals including preparing meals for one of them, she made sure they were dressed, and she chauffeured them around (Tr. at 38). Sometimes she was called in to cover someone else's shift (Tr. at 38). Sometimes she was called in but she was unable to go -- she was unable to get out of bed because of her fibromyalgia (Tr. at 38-39). There were also times when she was not able to go in to work her own shift because she was not physically able to get there (Tr. at 45).

Some days are worse than others with her fibromyalgia (Tr. at 39). On those bad days, she is not able to walk; her feet touching the floor causes severe pain (Tr. at 39). She has trouble sleeping at night so she is tired during the day (Tr. at 39). Plaintiff's body hurts and she does not feel like doing anything during the day (Tr. at 40). Plaintiff sleeps during the day for two to three hours (Tr. at 40). She does that because she is not feeling well (Tr. at 40).

Plaintiff experiences pain in her feet, shoulders, head, hand and back (Tr. at 40). Plaintiff was seeing Dr. Brownfield, her primary care doctor, who referred her to a rheumatologist (Tr. at 40). She is being treated at the university for fibromyalgia and osteoarthritis (Tr. at 40). The medications she was prescribed were not working, so the dosages were increased (Tr. at 41).

Plaintiff cannot lift more than 5 pounds due to pain in her neck and back (Tr. at 41). She can stand for 15 to 20 minutes before needing to sit (Tr. at 41). Plaintiff gets

shoulder pain, neck pain and arm pain from reaching over her head (Tr. at 41).

Reaching out front is painful in her right arm and shoulder (Tr. at 41). Plaintiff is right

handed (Tr. at 42). Plaintiff can sit for about 15 minutes before her thighs start hurting

(Tr. at 42).

Plaintiff is being treated at Burrell for her mental health condition (Tr. at 42). She

first went there in December 2012, but was on a waiting list until November 2013 (Tr. at

42). Since November 2013 plaintiff has been seeing a psychiatrist and a caseworker

(Tr. at 42). The caseworker comes to plaintiff's house and talks with her, and if she

needs to do anything or go anywhere, the caseworker takes her (Tr. at 43). The

caseworker takes plaintiff to medical appointments and helps plaintiff remember what

the doctor said (Tr. at 43). Prior to beginning treatment at Burrell, plaintiff was seeing

two therapists in Booneville (Tr. at 43). Plaintiff gets overwhelmed every day because

of thinking about things that happened to her in the past (Tr. at 44). She has trouble

concentrating, and this occurs during approximately 2 hours of the day (Tr. at 44). She

feels anxious and depressed and she has crying spells (Tr. at 44).

2.      **Vocational expert testimony.**

Vocational expert Theresa Wolford testified at the request of the Administrative

Law Judge.

The first hypothetical involved a person who could perform light work with

occasional stooping, crouching, crawling, kneeling and climbing, but no ladders, ropes

or scaffolding. The person would need to avoid concentrated exposure to extreme cold

and vibration and would be limited to simple, routine work (Tr. at 46-47). The vocational

expert testified that such a person could not perform any of plaintiff's past relevant work (Tr. at 47). The person could, however, perform the following jobs: routing clerk, DOT 222.687-022, SVP 2, light, with 3,153 jobs in the region (Iowa, Nebraska, Kansas and Missouri) and 74,788 in the country; mail clerk, DOT 209.687-026, SVP 2, light, with 4,007 in the region and 69,822 in the country; officer helper, DOT 239,567-010, SVP 2, light, with 1,920 in the region and 85,620 in the country; order clerk, DOT 209.567-014, SVP 2, sedentary, with 1,089 jobs in the region and 18,794 in the country; charge account clerk, DOT 205.367-014, SVP 2, sedentary, with 12,410 jobs in the region and 204,730 in the country; and document preparer, DOT 249.587-018, SVP 2, sedentary, with 4,771 jobs in the region and 97,252 in the country (Tr. at 47-58).

The second hypothetical involved a person who could occasionally lift 5 pounds, stand or walk for 20 minutes at a time and for a total of 2 hours per day, sit for 15 to 20 minutes at a time and for a total of 3 hours per day, and could only occasionally handle and finger (Tr. at 48-49). The person could not work because she would only be able to stand, walk or sit for a total of 5 hours per day; all of the jobs discussed above require an ability to lift more than 5 pounds; and all of the jobs require more than occasional handling and fingering (Tr. at 49). All of these jobs also require frequent reaching (Tr. at 49).

If a person, due to her impairments, missed three days of work per month on average, the person could not work (Tr. at 48). If the person had to take extra breaks totaling one hour per day on average, the person could not work (Tr. at 48). If the

31

person were unable to maintain attention and concentration for 20% of the workday in addition to taking breaks, the person could not work (Tr. at 49).

## V.    FINDINGS OF THE ALJ

Administrative Law Judge Linda Sybrant entered her opinion on August 18, 2014 (Tr. at 10-24). Plaintiff's last insured date was December 31, 2014 (Tr. at 12).

Step one. Plaintiff has not engaged in substantial gainful activity since May 6, 2013, her amended alleged onset date (Tr. at 12).

Step two. Plaintiff suffers from the following severe impairments: fibromyalgia and variously diagnosed depression, PTSD, and anxiety (Tr. at 12). Plaintiff's alleged seizure disorder is not a medically determinable impairment -- she reported in August 2012 that she had not had any seizures for several years, in May 2013 a consultative examiner found no significant findings on exam, plaintiff has never seen a neurologist, and plaintiff continues to drive and has a chauffeur's license (Tr. at 13). Plaintiff's alleged hand numbness and tingling is not a medically determinable impairment -- on November 18, 2013, she had injection therapy which she reported two months later had greatly helped, and there were no significant findings on exam by Dr. Velez (Tr. at 13).

Step three. Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of a listed impairment (Tr. at 13-15).

Step four. Plaintiff maintains the residual functional capacity to perform light work -- she can lift and carry up to 20 pounds occasionally and up to 10 pounds frequently; stand or walk for 6 hours per day; sit for 6 hours per day; occasionally stoop, crouch, crawl, kneel or climb except no ladders, ropes or scaffolds; must avoid

concentrated exposure to extreme cold and vibration; and is limited to performing simple, routine work (Tr. at 15-22). With this residual functional capacity, plaintiff cannot perform her past relevant work as a janitor, security guard, secretary or home attendant (Tr. at 22).

Step five. Plaintiff is capable of performing other jobs available in significant numbers such as routing clerk, mail clerk, office helper, order clerk, charge account clerk, or document preparer (Tr. at 23-23). Therefore she is not disabled (Tr. at 24).

## VI.    RESIDUAL FUNCTIONAL CAPACITY

Plaintiff argues that the ALJ erred in assessing plaintiff's residual functional capacity, specifically the ALJ improperly relied on the opinion of the consultative neurologist Dr. Velez and gave too little weight to the opinions of plaintiff's treatment providers, Dr. Brownfield and Nurse Practitioner Davenport.

A claimant's residual functional capacity is the most she can do despite the combined effects of all of the limitations attributable to her medical impairments that the ALJ finds to be consistent with and supported by the overall record. 20 C.F.R. §§ 404.1545 and 416.945. An ALJ's residual functional capacity assessment is based on all record evidence, including the claimant's testimony regarding her symptoms and limitations, the claimant's medical treatment records, and the medical opinion evidence. Wildman v. Astrue, 596 F.3d 959, 969 (8th Cir. 2010); 20 C.F.R. §§ 404.1545 and 416.945; SSR 96-8p. An ALJ may discredit a claimant's subjective allegations of disabling symptoms to the extent they are inconsistent with the overall record as a whole, including the objective medical evidence and medical opinion evidence; the

33

claimant's daily activities; the duration, frequency, and intensity of pain; dosage, effectiveness, and side effects of medications and medical treatment; and the claimant's self-imposed restrictions.  Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984); 20 C.F.R. §§ 404.1529 and 416.929; SSR 96-7p.

The ALJ in this case found plaintiff's subjective complaints of disabling symptoms not entirely credible.  Plaintiff does not allege in her brief that the ALJ erred in making this credibility finding.  Rather, plaintiff's argument centers on the ALJ's treatment of the medical opinion evidence.

### *Dr. Brownfield*

A treating physician's opinion is granted controlling weight when the opinion is not inconsistent with other substantial evidence in the record and the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques.  Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005); Ellis v. Barnhart, 392 F.3d 988, 998 (8th Cir. 2005).  If the ALJ fails to give controlling weight to the opinion of the treating physician, then the ALJ must consider several factors to determine how much weight to give the opinion including length of the treatment relationship and the frequency of examination; nature and extent of the treatment relationship; supportability, particularly by medical signs and laboratory findings; consistency with the record as a whole; and other factors, such as the amount of understanding of Social Security disability programs and their evidentiary requirements or the extent to which an acceptable medical source is familiar with the other information in the case record. 20 C.F.R. §§ 404.1527, 416.927.

34

On January 7, 2013 -- prior to plaintiff's alleged onset date -- Dr. Brownfield completed a Verification of Disability in connection with plaintiff's application for housing assistance. Dr. Brownfield checked the "yes" box indicating that plaintiff has a disability, as defined in 42 U.S.C. § 423, which means an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. She also checked the "yes" box indicating that plaintiff has a physical, mental or emotional impairment that is expected to be a long-continued and indefinite duration, substantially impedes her ability to live independently, and is of such a nature that the ability to live independently could be improved by more suitable housing conditions. The form does not require the doctor to identify the impairments or the basis for the doctor's opinion.

On April 24, 2013 -- also prior to plaintiff's alleged onset date -- Dr. Brownfield completed interrogatories finding that plaintiff would not be able to sustain an 8-hour/40-hour-per-week workweek, plaintiff is not able to stand or walk for 6 hours per day with breaks, she is able to sit for 6 hours per workday, and she can frequently lift less than 10 pounds.

The ALJ had this to say about Dr. Brownfield:

The claimant followed up on fibromyalgia with Dr. Brownfield on January 7, 2013. Cymbalta was increased to 20 mg twice a day and Trazodone to 150 mg at night, and it was recommended that she seek counseling. She was smoking, but said that she was trying to quit. At her next appointment, the claimant continued to complain of pain all over and wanted to try Flexeril. Findings on examination were normal. As requested by the claimant, Dr. Brownfield prescribed Flexeril 10 mg. [S]he advised her to exercise for 30 minutes a day, five times a week, and

35

told her that swimming was the best form of exercise. . . . On April 17, 2014, [s]he again advised her to make some lifestyle changes, including better sleep, regular exercise and counseling. . . .

On December 26, 2012,[17] Dr. Brownfield completed a "Verification of Disability" for assisted living benefits at Village Meadows Apartments. Dr. Brownfield opined that the claimant has a disability, as defined in 42 U.S.C. 423. She further stated that the claimant had a physical, mental, or emotional impairment that was expected to be of a long, continued and indefinite duration, which substantially impeded her ability to live independently, and was of such a nature that the ability to live independently could be improved by more suitable housing conditions. . . .

On April 24, 2013, Dr. Brownfield completed a disability questionnaire and opined that the claimant would not be able to sustain an 8-hour workday 40 hours a week. She further opined that the claimant could not stand or walk for 6 hours out of an 8-hour workday with normal breaks, but that she could sit for 6 hours during a workday. She additionally opined that the claimant could only lift or carry less than [10] pounds. . . .

With regard to the opinions of . . . Dr. Brownfield, . . ., an individual's residual functional capacity and whether an individual is "disabled" under the Act are not medical issues regarding the nature and severity of an individual's impairments, but are administrative findings that are dispositive of a case. The regulations provide that the final responsibility for deciding these issues is reserved to the Commissioner. Opinions by [a] treating source on issues reserved to the Commissioner are never entitled to controlling weight or special significance. Although not afforded any weight, the opinions have not been ignored. [However,] [her] opinions are extreme and not supported by the claimant's medical conditions or by the record. . . . [W]ith fibromyalgia exercise is encouraged. Additionally the claimant had full range of motion on examination. . . . In the end, little weight is given to the opinions of the treating doctors because they are extreme in light of the actual findings documented in the record, based on the self-reporting of an individual seeking disability, and overall not supported by the medical evidence.

(Tr. at 16-21).

---

[17]Although plaintiff signed and dated this form on December 26, 2012, Dr. Brownfield did not complete the form until January 7, 2013, during plaintiff's follow-up visit.

Plaintiff first saw Dr. Brownfield on December 5, 2012. On that day, Dr. Brownfield's medical records reflect that the only examination she performed was listening to plaintiff's heart and lungs. Although she prescribed medication to treat plaintiff's insomnia, she also noted that she had to tell plaintiff to stop drinking coffee all day until 5:00 p.m. No abnormalities were observed or noted in this record. Dr. Brownfield diagnosed fibromyalgia based on plaintiff's statement that she has fibromyalgia. No tender points were noted. No previous medical records were reviewed. On the very next visit, only one month later, Dr. Brownfield completed the check-box form indicating that plaintiff is disabled, in support of plaintiff's application for government housing assistance. Dr. Brownfield did not perform any exam during this visit.

As the ALJ noted, Dr. Brownfield's opinion in the January 7, 2013, form is not only completely conclusory, providing only the ultimate opinion on disability that is reserved for the Commissioner, she did not identify any disability and no disability can be gleaned from the medical records of her treatment of plaintiff up to that time. Furthermore, this was prior to plaintiff's alleged onset of disability. The ALJ properly gave no weight to this opinion.

The next time plaintiff saw Dr. Brownfield was two months later. Dr. Brownfield observed that plaintiff appeared well and comfortable despite plaintiff complaining of all-over pain, muscle spasms in her feet, joint pain, limited range of motion, muscle aches and stiffness. Again, her physical exam was limited to listening to plaintiff's heart and lungs. She recommended that plaintiff exercise at least 30 minutes per day and

37

commented that swimming would be especially helpful.  I note that swimming would appear to require the ability to reach in most if not all directions.  A month later (April 3, 2013), Dr. Brownfield again observed that plaintiff was "well appearing and comfortable" despite alleging fatigue, pain, limited range of motion, aches and stiffness.  The physical exam was limited to listening to plaintiff's heart and lungs.  Again, Dr. Brownfield told plaintiff to exercise 30 minutes every day, "swimming is best."

There are no other medical records between the time of this April visit and when Dr. Brownfield completed the interrogatories in connection with plaintiff's application for disability benefits indicating that plaintiff could not sustain an 8-hour/40-hour-per-week workweek, she was unable to stand or walk for 6 hours per day with breaks, and she could lift less than 10 pounds.  The ALJ properly noted again that Dr. Brownfield's opinion is not supported by her own treatment records.  Once again, this was prior to plaintiff's alleged onset of disability.

Plaintiff saw Dr. Brownfield on May 6, 2013 -- her alleged onset date.  On that day, Dr. Brownfield did not perform any exam but observed that plaintiff was "well appearing."  Three months later plaintiff was noted to be well appearing and Dr. Brownfield's examination, according to her records, was limited to listening to plaintiff's heart and lungs.  Four months later, Dr. Brownfield observed that plaintiff was well appearing and comfortable.  Nothing was said about fibromyalgia on this visit.

That is the extent of Dr. Brownfield's treatment of plaintiff.  The ALJ correctly gave little to no weight to the opinions of Dr. Brownfield who performed no relevant physical examinations, made no abnormal findings, and never observed physical

limitations or recommended physical restrictions but instead encouraged daily exercise including swimming.

### *Nurse Davenport*

Plaintiff argues that the ALJ erred in failing to give more weight to the opinion of Deanna Davenport, APRN, in the Rheumatology IM Clinic. On February 12, 2014, Ms. Davenport completed interrogatories in connection with plaintiff's application for benefits and completed a medical source statement physical. When asked for the basis for a diagnosis of fibromyalgia, Ms. Davenport wrote:

> She has chronic diffuse musculoskeletal pain with tenderness to touch, chronic poor sleep and associated cognitive deficits. Full workup to rule out autoimmune or infections, degenerative causes was done.[18] Per American College of Rheumatology's classification criteria, she has fibromyalgia. Daily significant fatigue is seen with fibromyalgia. Fibromyalgia also causes chronic widespread musculoskeletal pain which is usually worsened by physical activity.

Ms. Davenport found that plaintiff can lift not more than 5 pounds. She can stand or walk for 20 minutes at a time and for a total of 2 hours per day. She can sit for 15 to 20 minutes at a time and for a total of 3 hours per day. She is limited to pushing and pulling 5 minutes of low weight/pressure. She can never climb, stoop, kneel, crouch, bench or reach. She can occasionally balance, handle and finger. She can frequently feel. "Any physical activity increases pain, even minor motions as with hands. She would be limited to 15-20 minutes at a time before a break would be needed." Ms. Davenport noted that reclining and lying down for 30 minutes at a time,

---

[18]No records of any of these tests were included in the administrative record.

Case 6:15-cv-03528-REL   Document 21   Filed 11/30/16   Page 39 of 46

one to three times per day for each of reclining and lying down, is necessary to control plaintiff's existing pain and fatigue.

The ALJ is obligated to consider third party information and observations in determining a claimant's ability to perform work-related activities. 20 C.F.R. § 404.1513(d)(4). Social Security Ruling 06-3p clarified how SSA considers opinions from sources who are not what the agency terms "acceptable medical sources." SSA separates information sources into two main groups: "acceptable medical sources" and "other sources." It then divides "other sources" into two groups: medical sources and non-medical sources. 20 C.F.R. §§ 404.1502, 416.902 (2007). Acceptable medical sources include licensed physicians (medical or osteopathic doctors) and licensed or certified psychologists. 20 C.F.R. § § 404.1513(a), 416.913(a) (2007). According to Social Security regulations, there are three major distinctions between acceptable medical sources and the others:

1.      Only acceptable medical sources can provide evidence to establish the existence of a medically determinable impairment. Id.

2.      Only acceptable medical sources can provide medical opinions. 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2) (2007).

3.      Only acceptable medical sources can be considered treating sources. 20 C.F.R. §§ 404.1527(d) and 416.927(d) (2007).

In the category of "other sources," again, divided into two subgroups, "medical sources" include nurse practitioners, physician assistants, licensed clinical social workers, naturopaths, chiropractors, audiologists, and therapists. "Non-medical

40

sources" include school teachers and counselors, public and private social welfare agency personnel, rehabilitation counselors, spouses, parents and other caregivers, siblings, other relatives, friends, neighbors, clergy, and employers. 20 C.F.R. §§ 404.1513(d), 416.913(d) (2007).

"Information from these 'other sources' cannot establish the existence of a medically determinable impairment," according to SSR 06-3p.  Sloan v. Astrue, 499 F.3d 883, 888 (8th Cir. 2007).  "Instead, there must be evidence from an 'acceptable medical source' for this purpose.  However, information from such 'other sources' may be based on special knowledge of the individual and may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function." Id. quoting SSR 06-3p.

In general, according to the ruling, the factors for considering opinion evidence from "other sources" include:

- How long the source has known and how frequently the source has seen the individual;

- How consistent the opinion is with other evidence;

- The degree to which the source presents relevant evidence to support an opinion;

- How well the source explains the opinion;

- Whether the source has a specialty or area of expertise related to the individual's impairment(s); and

- Any other factors that tend to support or refute the opinion.

41

Not every factor will be applicable in every case. "Although there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, the adjudicator generally should explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." Id.

The ALJ had this to say about the opinion of Ms. Davenport:

On May 15, 2013, she was seen, for the first time, by Deanna Davenport, APRN, in the Rheumatology Clinic at the University of Missouri Hospital. Nurse Davenport noted that problems addressed at the visit were depression, fibromyalgia and complaints regarding sleep. She diagnosed fibromyalgia based on the claimant's reported symptoms of chronic daily pain exacerbated by cold weather and physical activity, and found that depression, anxiety and post-traumatic stress disorder were contributing factors to pain. On examination, the claimant's range of motion was normal and 16 out of 18 FMS tender points were found. . . .

On February 12, 2014, Nurse Davenport, as recommended by Dr. Brownfield, completed an interrogatory questionnaire for the claimant's representative. Nurse Davenport indicated that the claimant's fibromyalgia caused diffuse musculoskeletal pain and fatigue, usually worsened by physical activity, cold, stress and poor sleep. Nurse Davenport also completed a physical medical source statement saying she could not lift more than five pounds and could only stand or walk for a total of 2 hours for 20 minutes at a time and sit for a total of 3 hours for 15 to 20 minutes at a time. She could only push or pull low weights at low pressure for a maximum of 5 minutes at a time. She further opined that the claimant could never climb, stoop, kneel, crouch, bend or reach, and she could only occasionally balance, handle or finger, but she could frequently feel. Because of pain, all activity, including minor hand motion, would need to be limited to 15 to 20 minutes at a time before a break would be needed. She opined that the claimant would need to assume a reclining position for up to 30 minutes at a time for up to 1 to 3 times a day, and a supine position for the same time and frequency as for reclining. . . .

42

> [Her] opinion is extreme and not supported by the claimant's medical conditions or by the record. In addition, Nurse Davenport is not an acceptable source and her stringent limitations are not supported by the fact that with fibromyalgia exercise is encouraged. Additionally the claimant had full range of motion on examination.

(Tr. at 16-21).

Nurse Davenport first saw plaintiff on May 15, 2013. On exam plaintiff had normal range of motion in her hands, wrists, elbows, shoulders, back, hips, knees, ankles, and feet. Plaintiff had 16 of 18 fibromyalgia tender points. Two months later, plaintiff again had completely normal range of motion in all body parts but the same fibromyalgia tender points. Her blood work was normal except it showed low Vitamin D. Nurse Davenport told plaintiff to perform mild aerobic exercise daily. This is inconsistent with her opinions in which she states that plaintiff must essentially not move and remain bed-ridden all but five hours of the day.

Three months later, plaintiff again had normal range of motion everywhere but 16 of 18 fibromyalgia tender points. The following month, plaintiff told Ms. Davenport that Lyrica was helping some with her pain. Ms. Davenport noted that EMG and nerve conduction studies ruled out carpal tunnel syndrome. Range of motion was entirely normal but the tender points were still present. X-rays of plaintiff's lower back were normal except for a congenital anomaly. Two months later, plaintiff's wrist numbness was improved, her sleep and mood were OK, Lyrica was making her daily pain more tolerable, Plaintiff had normal range of motion but 16 tender points.

Those are all of the medical records from Ms. Davenport before she completed the interrogatories and medical source statement. Two months after she provided

Case 6:15-cv-03528-REL   Document 21   Filed 11/30/16   Page 43 of 46

those opinions -- limiting plaintiff to standing/walking for 2 hours per day, sitting for 3 hours per day, never reaching, never bending, only occasionally handling and fingering, and stating that "any physical activity" increases plaintiff's pain, and even minor motions with her hands must be limited -- Nurse Davenport saw plaintiff again and recommended regular exercise.

The ALJ correctly noted that Ms. Davenport's own medical records do not support her opinion of "stringent limitations."

### Dr. Velez

Finally, plaintiff argues that the ALJ erred in relying on the opinion of Dr. Velez because he was a consultative neurologist who had a complaint against him at the time of the hearing. The ALJ had this to say about plaintiff's objection to Dr. Velez:

> On May 28, 2013, Dr. Velez, a consultative physician, examined the claimant on referral by the State agency. The claimant complained of a childhood head injury, which allegedly caused her to fall to the ground and shake. Although she was placed on anticonvulsants, there was no diagnostic testing, such as an EEG or imaging studies, establishing that she suffered from seizures, and she continues to drive an automobile. She also complained of multiple abusive relationships that contributed to posttraumatic stress disorder, anxiety, depression and difficulty sleeping and eating. She further complained of fibromyalgia pain that she treats with Cymbalta, which helps. She complained that her requests for stronger medication were denied. The physical examination was normal. She was alert and maintained appropriate eye contact, and she had a normal gait and stance. Dr. Velez completed a range of motion chart with the following findings: She had full strength in all muscle groups in both the upper and lower extremities with no evidence of fasciculations, tremors, atrophy or rigidity; straight leg testing was negative, as was Phalen's and Tinel's signs; and reflexes were within the normal limits in both upper and lower extremities. There was no swelling or any other type of joint deformity. Multiple points in both her upper and lower body were all negative for signs of fibromyalgia. She was capable of bending over to touch her toes, raise her arms overhead, and squat and rise from that position. Although she reported to the examiner and her other doctors that she had seizures, there were no significant findings on examination,

she had never seen a neurologist, and she continued to drive and did not have any further seizures.  Based on his findings on examination, Dr. Velez found the claimant did not have limitations in sitting, standing or walking.  Nor did she have any manipulative limitations, lifting or carrying limitations or verbal or written communication problems.  Dr. Velez diagnosed a history of anxiety and depression and a history of seizure in the past, now resolved.

At the hearing, the representative objected to Dr. Velez's opinion and claimed that it was not made in his area of expertise.  The representative also submitted a copy of a formal complaint filed against Dr. Velez, which is currently pending and the allegations of which have yet to be established as factual.  Dr. Velez has the expertise to perform physical examinations, which in this case showed no real issues.  Because this examining physician's opinion is supported by his findings on examination and is generally consistent with the claimant's admitted capabilities, it is given weight in reaching a conclusion as to the claimant's physical residual functional capacity.  At the same time, the undersigned further limits the claimant's functional abilities, giving her the benefit of the doubt.

(Tr. at 18-19).

Plaintiff's counsel had submitted a copy of a formal complaint filed against Dr. Velez on July 19, 2013, relating to surgical procedures he performed on certain individuals in 2008 and 2009 (Tr. at 311-320).  However, any evidence of a subsequent disciplinary complaint against Dr. Velez, which was specifically considered by the ALJ and was unrelated to that doctor's consultative physical examination of plaintiff, does not in and of itself invalidate Dr. Velez's opinion as to plaintiff's functional capabilities, which the ALJ found to be consistent with his examination findings.  See, e.g., Ford v. Colvin, No. 14-00830-MDH, 2015 WL 5619303, at *3 (W.D. Mo. Sept. 24, 2015) ("While the Court acknowledges that Dr. Velez has subsequently been placed on probation from the practice of neurosurgery, there is nothing in the record that constitutes a reversible error with regard to the ALJ's evaluation of the record as a whole.  Other than

Case 6:15-cv-03528-REL   Document 21   Filed 11/30/16   Page 45 of 46

Plaintiff's argument that Dr. Velez has now been disciplined, Plaintiff offers nothing to show how that affected his evaluation of Plaintiff.").

As the ALJ noted, Dr. Velez's findings are largely consistent with plaintiff's treatment records with other doctors. The only person ever to find fibromyalgia trigger points was a nurse practitioner. The treating doctor who diagnosed fibromyalgia made that diagnosis based on nothing more than plaintiff's statement that she had been diagnosed with fibromyalgia in the past. Plaintiff's physical exams were otherwise essentially normal. The ALJ properly relied on the opinion of Dr. Velez in assessing plaintiff's residual functional capacity.

## VII.    CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is affirmed.


/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
November 29, 2016